IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                      CR NO.   14- 2772 WJ

MICHAEL ACE YONNIE,

    Defendant,

## DEFENDANT YONNIE'S SENTENCING MEMORANDUM

COMES NOW Defendant Michael Ace Yonnie, by his court-appointed attorney, John F. Moon Samore, Esq., pursuant to the Rules, for his Sentencing Memorandum, to STATE:

## STATEMENT OF CASE

On July 21, 2014, Michael Ace Yonnie appeared before the Magistrate Judicial Court on a criminal complaint, arising from homicides that occurred near his grandmother's home on July 14 in Torreon, rural New Mexico. He was taken into custody and has been detained since the date of the incident.

On July 31, a Redacted Indictment charged him with two counts of first-degree murder. His delusional mental state seemed apparent from the date of the homicides, and his attorney moved for *ex parte* Psychological Evaluation September 9. On January 26, 2015, the court-authorized Psychological Evaluation by Dr. Susan Cave found Mr. Yonnie not competent to proceed further. The parties agreed, pursuant to controlling statute, he should be committed to the custody of the Attorney General for the standard 120 days to be treated, if possible, to competency at a qualified federal hospital.

Mr. Yonnie was assigned to FCI-Springfield, where his initial commitment was extended

to over eighteen months by FCI request on March 28, 2016, and agreed Court Order. After a tentative finding of legal competency by Dr. Richard DeMier on August 12, 2016 that he seemed competent, Mr. Yonnie was returned to New Mexico in early 2017.

A major legal matter, pending before the Court, was evidentiary hearing on a Motion to Suppress Statements (Doc 78), for which his understanding and competency to voluntarily waive his Miranda Rights were the primary issues. The Defense had him evaluated by psychiatrist Gerald Fredman to assess his comprehension and competence waive and make a statement to law enforcement officers shortly after the fatal incident. This Evaluation was completed December 5, 2017. The Government had its own Evaluation of those factors performed by Dr. DeMier, which was completed on October 12, 2018.

Pursuant to their ethical responsibilities, while preparing for the evidentiary hearing, the parties continued to negotiate possible plea resolution, Mr. Yonnie's competence again became a concern, so he was evaluated for competence by Dr. William Foote, who found Mr. Yonnie competent on March 13. On March 20, Mr. Yonnie entered a guilty plea to two count of second-degree murder for an agreed sentence of twenty years imprisonment under 11(c)(1)(C).

The Pre-Sentence Report was submitted on May 7, 2019, and this matter comes on for sentencing.

## STATEMENT OF FACTS

On June 24, 2014, Mr. Yonnie's sister, Valerie, was found next to her Grandmother's home in rural Torreon. Valerie's body was slumped under a tree with a belt around her neck and her feet on the ground. Her older brother, Michael, had been living most of his life in a very remote area with his alcoholic Father and paternal grandmother near Winslow, Arizona. He dropped out of school in eighth grade, had no friends his own age, and no social skills. Michael

had only recently returned to Torreon to visit her. (Valerie and her Mother Carol Yonnie were in the process of moving into the humble home of Carol's Mother Betty Platero.) When Michael learned of his sister's death, he immediately rushed to the scene. The only person to whom he felt close was his sister, and his grief was, as subsequent events made manifest, severe and unbearable.

Michael retained disturbing memories of what happened when he arrived at the scene to overhear a law officer talking to neighbors. He became convinced that she had not hung herself but that foul play was involved. For the next few weeks, Michael lived in a car parked in front of Grandmother Betty's two-hundred square foot shack, located on a deeply-rutted dirt path about a quarter mile off State Road 79 in Torreon. The car was registered to his Mother, Carol, who herself now lived in the hovel, but Michael considered it to be his sister's car and staying in it and around it made him feel connected to Valerie.

His Grandmother informed him several times that Darrell Joe and a neighbor, Andy Sandoval, had admitted he was at least partly responsible for his sister's death. Sandoval's partner is Michael's clan aunt, Laverne. Michael's mother, Carol, was a very troubled, alcoholic, and severely co-dependent. Her equally alcoholic, periodic boyfriend, Darrell Joe, had recently spent almost four years in prison for the felony aggravated assault conviction after, in a drunken rage, he buried a hatchet in her skull and almost killed her. Before her death, Valerie had told Michael how Darrell would drag her by the hair, and Carol would do nothing to protect her.

On July 18, 2014, after his Mother had driven Michael back to the residence from errands in Cuba (a village one hour away), Michael was again sitting in his sister's car. When he saw Darrell approaching the hut with his sleeping bag, backpack, and a cooler of beer, Michael got out of the car, and, based on his statements to the psychiatrist and the agents, stabbed Mr. Joe

and went to the home of neighbor Sandoval and stabbed him. Both men died. He waited for law enforcement officers to arrive and gave a statement to two FBI agents within an hour of the incident.

On March 19, 2018, the Defense filed its Motion to Suppress those statements (Doc. 78). On April 3, 2018, the Defense filed its Notice of Rule 12.2 Defense (Doc. 94), which posited that, due to his mental disease or defect, Mr. Yonnie was unable to form the elements required for murder, premeditation or malice aforethought, although it did not dispute the Defendant knew what he did was wrong and intended to kill each man.

In January 31, 2017, Michael's Mother was found dead at the bottom of a mesa (sometimes, described as a "cliff") located near the Platero home in Torreon. While some folks, aware that she had at least twice been beat up recently by certain relatives of Mr. Joe, suspected foul play, no genuine investigation was conducted. OMI's Report noted only that she had been with "friends" for a night of drinking, but only one "friend" was ever interviewed, and her death was found to be an "accident" due to "hypothermia."

In December, 2018, Michael's father, Michael Ace Yonnie, Sr., with whom Michael lived his formative years, was walking on the shoulder of a road in rural Arizona, struck, and killed by a hit-and-run driver. He has not heard from his older sister in more than a decade, and his younger brother, severely impaired from birth, lives in a care facility somewhere.

The Defense will touch briefly on Michael's psychological testing, because the Court and Government are informed through other Motion practice. In all his evaluations, he was found to be giving his best effort, never malingering. In all evaluations, he was found to be in the lowest fifteen percent on intelligence scales and his profound mental conditions were fluid and had never been treated.

Dr. Gerald Fredman's December 5, 2017 Diagnostic and Forensic Evaluation, from a psychiatrist's viewpoint, found Mr. Yonnie's condition to be severe and long-standing, primarily because of the irrefutable negative symptoms, which a psychologist is not qualified to diagnose. Among other things, Dr. Fredman concluded that the issue of whether Mr. Yonnie was able to comprehend his Fifth Amendment Rights in the immediate aftermath of the incident when Mr. Yonnie was first interviewed by agents was "problematic," He left to the Court and the evidence at the upcoming hearing for the actual legal conclusions.

Any reservation that Dr. DeMier may have had in late 2016 when he discharged Mr. Yonnie from FCI as "competent" has been tempered by his more recent evaluation of October 12, 2018; therein, Dr. DeMier concluded Michael was still actively hallucinating, schizophrenic, and actively psychotic.

Dr. DeMier pointedly recognized for the first time Michael exhibited "ideas of reference," which Dr. Cave had identified almost four years previously in her Evaluation. He concluded Mr. Yonnie had the intent to kill (*mens rea*) but could not support pre-mediation or malice, which was precisely the Defense's fighting legal issue throughout the pendency of this matter.

Dr. Foote examined Michael March 13 and concluded he was competent to proceed with legal matters. (His report was not filed until March 27.) Michael was competent to enter his plea of guilty to both second degree murder charges by Information on March 19, 2018.

In his PSR interview, Michael calmly described his painful and isolated childhood, horrors including (but hardly limited to) being isolated and friendless living with his Father in remote Arizona so he was scarred with no education, never a girlfriend, being raped by a neighbor as his first childhood memory, and years of calming himself by his choice of either

smoking marijuana (since age seven) or playing chess. This ghastly history culminated with the separate deaths of each birth parent, during his incarceration. When asked to sum up his childhood, Michael told the PSR writer (with no sense of irony), "Pretty normal."

The parties maintained an open channel to negotiation while vigorous motion practice continued regarding a Rule 12.2 Defense Notice (Doc. 94), and the Government's desire for further psychological evaluation, which was authorized by the Court (Doc. 104) on June 29, 2018. Dr. DeMier, who had served as the primary psychologist at FCI-Springfield to treat Mr. Yonnie 2015-2017, came out of his retirement to conduct that evaluation in early October, and his findings were submitted to the Court on October 12. The parties were able to reach a plea resolution in early 2019.

After Mr. Yonnie's competency to assist his counsel and enter a plea agreement were confirmed by Dr. William Foote's timely psychological evaluation March 13, 2019, Mr. Yonnie entered a guilty plea to a two-count information (Doc. 138) on March 20, 2019. That plea agreement contained 11(c)(1)(C) to an agreed term of twenty years' imprisonment. A pre-sentence report was prepared and submitted on May 10, 2019. Sentencing has been set for June 17. This Sentencing Memorandum urges the Court accept the plea agreement as a fair resolution of a very difficult case.

## STATUTORY FRAMEWORK

The statutory framework of federal sentencing has changed in recent years. 18 USC §3553(a) requires the court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, and imposes a statutory duty to consider:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;
2) the purposes of criminal punishment;
3) the kinds of sentence available;

  4) the Guideline range;
  5) Sentencing Commission Policy Statements;
  6) the need to avoid unwarranted sentencing disparities; and
  7) the need to provide restitution.

The purposes of federal sentencing enumerated in 18 USC §3553(a)(2) are the need for the sentence imposed:

  a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  b) to afford adequate deterrence to criminal conduct;
  c) to protect the public from further crimes of the defendant; and
  d) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

The guidelines are presumed to be "reasonable." United States v. Nelson, 129 S. Ct. 890 (2009). Federal district courts may deviate from the guidelines in order to tailor individual sentences in light of other 3553 factors. Kimbrough v. United States, 128 S. Ct. 558 (2007). The federal sentencing guidelines are not mandatory and are but one factor the court may consider in imposing sentence. United States v. Booker, 543 U.S. 220, 125 S. Ct., 739 (2005). No rule specifically requires any "extraordinary" circumstances to justify a sentence outside the Guidelines. District court sentencing decisions are reviewed for an abuse of discretion. Gall v. United States, 128 S. Ct. 586 (2007).

In this case, the parties negotiated an 11(c)(1)(C) plea agreement that is within this Court's discretion to accept. At the time the plea was entered on March 20 before this District Judge, the Court indicated that it was inclined to accept this plea agreement.

**ADDITIONAL SENTENCING AUTHORITIES - RESEARCH AND TREATISES**

"[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J.

48S, 50S (2011).  "[A]cross the offender population, imprisonment does not have special powers in persuading the wayward to go straight.  To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified. Id. at 51S.

"[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction—such sanctions may increase the likelihood of recidivism.  The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence."  Mark W. Lipsey and Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007), available at http://cjjr.georgetown.edu/pdfs/ ebp/lipsey_cullen2007.pdf; see also Don M. Gottfredson, National Institute of Justice, Effects of Judges' Sentencing Decisions on Criminal Cases, Research in Brief 9 (Nov. 1999) ("confinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects"), available at http://www.ncjrs.gov/ pdffiles1/nij/178889.pdf.

## DISCUSSION

It could rarely be said more compellingly:  "There are no winners here, only tragedy."  The matter at bar is an immense tragedy of Shakespearian dimensions.

The homicides occurred in a painfully poor, isolated rural area of our state.  They followed the already curious and tragic death of Mr. Yonnie's younger sister Valerie, for which no investigation or autopsy was conducted and was commonly presumed to be a suicide.  The toll of tragedy rose with these two homicides and continued further with the separate deaths of each of Mr. Yonnie's parents.  Now, alone in the unheated hut which Carol Yonnie and Valerie

Yonnie also called home, is Michael's grandmother Betty.

Michael's Grandmother suspected and told Michael that both men were responsible for his sister's death. had a significant role in Valerie's death. The first man to be stabbed, contrary to his Mother's indulgent description in the PSR (¶ 22), had a long history of violence, alcoholism, and cruelty to others. On July 14, Carol was taking Mr. Joe back into the home, and Michael, living since his sister's death in Valerie's car parked outside the little hut, was overwhelmed by the thought of the man who had abused both his Mother and sister, returning. He spontaneously grabbed the knife he kept under the car seat for his own protection from ghosts and shapechangers and the relentless voices he already resounding in his psychotic, schizophrenic mind. He went to the nearby home of his Aunt Laverne and, after a struggle, stabbed her husband Andy while she watched.

This Court has been conscientious and well-informed throughout the pendency of this daunting matter. Attorneys worked diligently to represent divergent interests, the Government to build its case for first-degree murders, the Defense to challenge essential elements of pre-meditation and malice of forethought, so the convictions would only be for voluntary manslaughters. The parties engaged in vigorous and complex litigation regarding issues of legal proof, fragile competency, highly-qualified experts, psychosis and its consequences, but always maintained a professional approach to these complex issues. A highly-respected psychiatrist and three eminently qualified psychologists examined Michael on at least seven occasions, and Mr. Yonnie is competent to understand and enter this plea agreement and serve his time. To bring this case to trial would stir agonizing memories, indescribable pain, and offer no comfort or closure to the victim's or Defendant's families. Those ineffable qualities and transcendence are not within the realm of our criminal justice system and reserved to higher powers.

United States v. Michael Ace Yonnie
Defendant Yonnie's Sentencing Memorandum

## **CONCLUSION**

To have gone from this tragic incident to a compromise plea agreement as resolution, with all the many legal and personal obstacles, in less than five years is an extraordinary achievement and a compliment to the professionalism of all involved.

Based on these egregious facts and this profound sorrow, the proposed sentence of twenty (20) years is eminently fair and should be accepted by this Court.

                                                Respectfully submitted,
                                                /s/ John F. Moon Samore, Esq.
                                                Attorney for Defendant
                                                P.O. Box 1993
                                                300 Central NW, Suite 2500 W
                                                Albuquerque, NM  87103
                                                (505) 244-0450

I hereby certify that a true and correct copy of the foregoing document was faxed to opposing counsel on the 28th of May, 2019.

/s/ John F. Moon Samore, Esq.